[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The petitioner, the Statewide Grievance Committee, filed a presentment on December 30, 1998 alleging attorney misconduct by the respondent, David M. Somers. According to the six count presentment, the respondent testified falsely, counseled witnesses to testify falsely, engaged in several conflicts of interest, and brought meritless civil claims before the Superior Court in violation of Rules 1.2, 1.7, 1.8, 3.1, 3.4 and 8.4 of the Rules of Professional Conduct.
In connection with the presentment, the court heard testimony on April 20, 21, 27 and 28, 1999 and May 4, 5, and 6, 1999. Each party later filed briefs and the court heard closing arguments on July 28, 1999. The court heard the testimony of five witnesses: Kimberley Barrett-McCord (Barrett-McCord), Gigette Coudriet, Richard Barrett, Joellen Gradowski and the respondent. Based upon the testimony of these witnesses and the exhibits, the court finds the following facts.
In the Spring of 1991, Richard Barrett was the president of the H.P. Townsend Manufacturing Co., Inc. H.P. Townsend produced metal working machinery and machine tools.[1] When Barrett sought a new attorney for H.P. Townsend and related corporations, he engaged the respondent concerning legal representation. The respondent represented H.P. Townsend Manufacturing Co., Inc. from January 1990 to September 9, 1991. In 1990 and 1991, H.P. Townsend had substantial financial difficulties. It had guaranteed loans to Connecticut National Bank (CNB) and other businesses.[2] In early 1991, it became apparent that H.P. Townsend's attempts to renegotiate its debt with CNB and to continue operations failed when the bank demanded that Mort Zimmerman, Chairman of the Board of Comtec, Inc. sign over personal assets. CT Page 12397
Throughout early-1991 to mid-1991, Barrett and the respondent discussed the possibility of Barrett forming a separate corporation and acquiring the assets of a machine tool building company. Both the respondent and Richard Barrett discussed the use of Kimberly Barrett-McCord, Richard Barrett's daughter, as the owner and the president of the new corporation.[3] At that time, Barrett-McCord was twenty-one-years old. She was a senior at Bryant College and had interests in a career involving wildlife conservation, not machine tool building.[4]
Eventually, Barrett-McCord agreed to become the president of a new corporation for her father.
The respondent and Barrett then discussed the acquisition of funds for the new corporation, TCE Corporation (TCE).[5] The respondent suggested that TCE acquire funding through a company called the Small Business Institute (SBI). He introduced Barrett to Rhonda Farrah and Bob Fradette of SBI, and set up meetings concerning funding for TCE. Despite his representation of TCE, the respondent had an undisclosed fee agreement with SBI in which he would receive a ten percent equity participation if the loan was successful.
During the initial incorporation of TCE in June 1991, there were four directors: Barrett, Barrett-McCord, Farrah and Fradette. In addition, the incorporation documents included Gigette Coudriet as the corporate secretary. At that time, Coudriet was the respondent's twenty-five-year-old legal assistant and paramour.[6] The respondent billed TCE $2,000 for its incorporation. It is uncertain who filed the incorporation documents with the secretary of state; however, it seems likely that Barrett-McCord did that filing.
Barrett had to find new methods to finance TCE and another new business MT Assembly Corporation (MT).[7] By August 1991, it became apparent that SBI would not provide the necessary financing for TCE. Instead, Barrett approached his mother, Barbara Barrett, for a loan.
In the middle of August 1991, H.P. Townsend shut down and CNB seized its production equipment. The respondent suggested that Barrett have another person purchase H.P. Townsend's assets, and then lease or sell the assets to TCE in order to give the appearance of an arms-length transaction. Coudriet, the corporate secretary of TCE, became the "independent" third party investor.[8] Barbara Barrett, issued a promissory note to CT Page 12398 Coudriet for approximately $40,000 so that her son could acquire the assets necessary for the new corporations. In addition, the respondent provided Coudriet with an additional $30,500 loan in order for her to purchase H.P. Townsend assets. Coudriet's bid for H.P. Townsend assets was successful and Coudriet executed a lease agreement with TCE and MT on October 9, 1991 concerning those assets.
Despite his substantial involvement with Barrett and Barrett-McCord in the formation of TCE and MT, the respondent did not resign as counsel for H.P. Townsend until September 1991. In addition, Barrett did not resign as president of H.P. Townsend until October 19, 1991.
In December 1991, the respondent represented TCE in an action seeking to hold TCE liable as a successor to the insolvent H.P. Townsend. See Jarvis Products Corp. v. Cleveland Tapping MachineCo., Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 399783. The respondent filed an objection to plaintiff's motion to cite in an additional defendant and argued that TCE was not a successor to H.P. Townsend. He further stated: "Plaintiff apparently is seeking any `deep pocket' that it can find inasmuch as Defendant Townsend and its division, Cleveland, are insolvent and inactive, from which Plaintiff has no reasonable expectation of recovery." Petitioner's Exhibit AAA, p. 3.
In 1993, the National Labor Relations Board conducted proceedings against H.P. Townsend, and made inquiries into whether TCE, MT, Barrett and Barrett-McCord acted as the alter ego for H.P. Townsend and were subject to successor liability. On February 25, 1993 and March 4, 1993, Barrett, Barrett-McCord and Coudriet gave depositions for the NLRB. The respondent served as the attorney for all three individuals and prepared them for their testimony. The respondent counseled Barrett to deny any involvement with the establishment of TCE or MT, and to deny any involvement with Farrah, Fradette or SBI.[9] The respondent counseled Barrett-McCord to testify that Coudriet and she decided that to purchase H.P. Townsend assets on their own, that Barrett had no involvement with the creation of the new corporations, and that they had never met Farrah and Fradette.[10] The respondent counseled Coudriet to testify that her purchase of H.P. Townsend assets were accomplished as a bona fide investment, using her own money, and that she had engaged in conversations with Barrett-McCord regarding her purchase.[11] At the present CT Page 12399 hearing, Barrett, Barrett-McCord and Coudriet have admitted that their testimony before the NLRB regarding these issues was false and the respondent counseled them to testify falsely.
By June 1993, Coudriet executed an assignment to the respondent providing him with her interest in the H.P. Townsend equipment and the promissory notes that MT and TCE provided to her in order for them to acquire the equipment. In exchange for this assignment, the respondent relieved Coudriet of her obligations under the promissory notes held by Barbara Barrett and the respondent. The respondent did not disclose the assignments to TCE and MT until January 10, 1994.
In September or October 1993, the professional and romantic relationship between Coudriet and the respondent ended. Upon the termination of these relationships, the respondent made allegations that Coudriet failed to advance to him the proceeds from the July and September 1993 lease payments. In addition, the respondent filed a criminal complaint against Coudriet for failing to send him the October 1993, November 1993 and December 1993 lease payments from Barrett-McCord. In letters dated January 10, 1994, the respondent advised TCE and MT that he would withdraw as counsel of record in the pending NLRB proceedings because Coudriet was "in default with respect to certain personal loan and other financial obligations to [the respondent] that could lead to litigation." Petitioner's Exhibits RR and TT. Citing a conflict of interest, the respondent demanded that TCE and MT remove Coudriet as a secretary and director, and requested that Linda Soucy, one of the respondent's legal assistants, assume those positions. In letters dated January 18, 1994 and January 20, 1994, the respondent advised TCE and MT that he was "no longer interested in doing business" with TCE and MT after the expiration of the asset leases since the respondent did not receive the October 1993, November 1993, December 1993 and January 1994 lease payments. Further, the respondent demanded a lump sum payment of $38,132.17 for the principal of the promissory note that he held from TCE by February 1, 1994.[12]
He withdrew as counsel to TCE and MT in January 1994.
With the respondent's demands unsatisfied, he filed a civil action against both TCE and MT in 1994. In Somers v. TCE Corp. , Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 704957, the respondent sought the principal and interest due under promissory notes to TCE and MT, and payments due on the leased equipment. In addition, the respondent CT Page 12400 claimed MT and TCE were unjustly enriched, committed conversion, committed civil theft, and violated the Connecticut Unfair Trade Practices Act. In Somers v. TCE Corp. , Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 705084, the respondent filed another complaint against TCE and MT claiming wrongful detention of his assets and demanded immediate possession of those assets. The initial pleadings contained no mention of the $40,000 that Barbara Barrett provided in order to purchase the assets, and that she had not been paid on that promissory note.
During the course of the civil proceedings, the respondent testified before the Honorable Julia Aurigemma on June 5 and June 6, 1996. The respondent testified that he did not incorporate TCE or MT.[13] He further testified that it was Barrett's idea to purchase the H.P. Townsend assets from CNB, Coudriet's leases to TCE and MT were part of an arms-length transaction,[14] denied that the purpose of Coudriet's purchase of the H.P. Townsend assets was to make it appear that Barrett or Barrett-McCord had nothing to do with the transaction, and denied any involvement in the bidding process for the H.P. Townsend assets.[15] The respondent's actions against TCE and MT were withdrawn on June 13, 1996.
In counts two through four, the petitioner alleges that the respondent violated rules 1.2, 3.4 and 8.4 of the Rules of Professional Conduct by counseling Barrett, Barrett-McCord and Coudriet to testify falsely during the NLRB depositions.[16] In count five of the presentment, the petitioner alleges that the respondent himself testified falsely before Judge Aurigemma inSomers v. TCE Corp. , supra, Superior Court, Docket No. 704957 andSomers v. TCE Corp. , supra, Superior Court, Docket No. 705084 in violation of rule 8.4 of the Rules of Professional Conduct.[17]
The respondent argues that he did not suggest the plan to use Coudriet as a cover and did not counsel any of the witnesses to lie before the NLRB. The respondent also challenges the credibility of the witnesses since they have admitted to lying under oath in the past. The respondent's arguments and testimony are not credible. Coudriet was the respondent's lover and worked in the respondent's office. She was a legal assistant and certainly did not understand the machine tool industry. It is ludicrous to suggest that Coudriet entered this business venture without the respondent's knowledge or involvement. CT Page 12401
While the respondent testified that it was Barrett who created the scheme to purchase H.P. Townsend assets, the respondent's involvement in the purchase is apparent. The respondent's time logs show that he spent substantial time meeting with Barrett and Barrett-McCord prior to the formation of TCE.[18] The respondent loaned Coudriet $30,500 to purchase the assets. The respondent acted as the corporate attorney and agent for service of process for TCE when it was incorporated. Aside from his dealings with Barrett and Barrett-McCord, Coudriet executed a power of attorney to respondent for handling the H.P. Townsend assets on October 2, 1991.[19] In addition, it is unlikely that Barrett, Barrett-McCord and Coudriet would understand the legal intricacies necessary to best protect TCE from the creditors of H.P. Townsend. Instead, the respondent would have the court believe that he had limited involvement in the purchase of H.P. Townsend assets despite the fact that between May 20, 1991 and October 28, 1991, the respondent's handwritten records indicate that he billed TCE for services rendered during 107 of the 162 days during that period of time. See Respondent's Exhibit 85. Any contention that the respondent did not have a significant involvement with TCE during its initial stages and the purchase of the H.P. Townsend assets is meritless.
The petitioner has provided clear and convincing evidence that the respondent counseled Barrett, Barrett-McCord and Coudriet to testify falsely during the NLRB depositions. Aside from his involvement in the formation of TCE and MT, the respondent served as the attorney for Barrett, Barrett-McCord and Coudriet during their depositions for the NLRB on February 25, 1993 and March 4, 1993. As previously stated, the respondent counseled Barrett to deny any involvement with the establishment of TCE or MT, and to deny any involvement with Farrah, Fradette or SBI. The respondent counseled Barrett-McCord to testify that Coudriet and she decided that to purchase H.P. Townsend assets on their own, that Barrett had no involvement with the creation of the new corporations, and that they had never met Farrah and Fradette. The respondent counseled Coudriet to testify that her purchase of H.P. Townsend assets were accomplished as a bona fide investment, using her own money, and that she had engaged in conversations with Barrett-McCord regarding her purchase. At the present hearing, Barrett, Barrett-McCord and Coudriet have admitted that their testimony before the NLRB regarding these issues was false and the respondent counseled them to testify falsely. The respondent's lack of credibility concerning the formation and purchase of H.P. Townsend assets and the direct CT Page 12402 testimony of Barrett, Barrett-McCord and Coudriet provides sufficient proof that the respondent counseled those three witnesses to testify falsely during the NLRB depositions.
According to rule 3.4(2) of the Rules of Professional Conduct, "[a] lawyer shall not . . . counsel or assist a witness to testify falsely. . . ." Rule 1.2(d) of the Rules of Professional Conduct states: "A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law." In addition, "[i]t is professional misconduct for a lawyer to . . . Engage in conduct involving dishonesty, fraud, deceit or misrepresentation." Rules of Professional Conduct 8.4(3). There is clear and convincing evidence that the respondent violated each of these rules when he counseled Barrett, Barrett-McCord and Coudriet to provide false testimony.
The petitioner also claims that the respondent made misrepresentations before Judge Aurigemma during his civil actions against TCE and MT in violation of rule 8.4 of the Rules of Professional Conduct. The respondent claims that he told the truth.
During the course of the civil proceedings, the respondent testified that he did not incorporate TCE or MT.[20] He further testified that it was Barrett's idea to purchase the H.P. Townsend assets from CNB, Coudriet's leases to TCE and MT were part of an arms-length transaction,[21] denied that the purpose of Coudriet's purchase of the H.P. Townsend assets was to make it appear that Barrett or Barrett-McCord had nothing to do with the transaction, and denied any involvement in the bidding process for the H.P. Townsend assets.[22] The respondent's testimony before Judge Aurigemma is not credible.
"`Misrepresentation' has been defined as any manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts. Where a party is under a duty to disclose facts and fails to do so, such failure has sometimes been referred to as `passive misrepresentation, and under various circumstances may result in liability against that party." (Citation omitted; internal quotation marks omitted.) Parese v. Statewide GrievanceCT Page 12403Committee, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 348079 (April 21, 1993, Wagner,J.)
The respondent was less than truthful when he discussed his involvement with the incorporation of TCE. While Barrett-McCord may have been the incorporator[23] of TCE, the respondent had substantial involvement with details that lead to the incorporation of TCE which he did not disclose during the civil trial. In addition, the respondent denied having seen the bill that he had charged TCE. While that may be true, the respondent's attempts to deny his involvement with the incorporation of TCE did not comply with his responsibility as an officer of the court to avoid "conduct that is prejudicial to the administration of justice." See Rules of Professional Conduct 8.4(4). It also constituted a misrepresentation to the court.
The respondent's other testimony before Judge Aurigemma demonstrates his pattern of dishonesty. Even if the court believed that Barrett suggested the purchase of the H.P. Townsend assets, the respondent's assertion that he did not have a significant involvement in the purchase of the Townsend assets is absurd. As noted earlier, the respondent loaned Coudriet, his legal assistant and lover, $30,500 in order to make her bid on the H.P. Townsend assets. The respondent provided a substantial amount of legal advice to TCE prior to Coudriet's bid on the assets. Coudriet also executed a power of attorney to the respondent concerning those assets. It is hard to believe that the respondent, an attorney, did not advise Coudriet concerning the bidding process.
The petitioner next claims that the respondent engaged in conflicts of interest in violation of rules 1.7 and 1.8 of the Rules of Professional Conduct. These allegations are based upon the respondent's representation of multiple parties with conflicting interests in the creation of TCE, the purchase of assets from H.P. Townsend, and the execution of a promissory note to himself. The petitioner also alleges that the respondent failed to make adequate disclosure of the conflicts to Barrett, Barrett-McCord and Coudriet.
The respondent contends that his involvement during the formation of TCE and MT was limited. The respondent also argues that he represented only TCE and MT during the acquisition of the H.P. Townsend assets from Coudriet. He claims that he informed CT Page 12404 Coudriet that he would not represent her during the transaction with TCE and MT, encouraged her to seek separate counsel, and gave her a letter explaining the possibility of a conflict due to his representation of TCE and MT. The respondent claims that the granting of a power of attorney concerning the H.P. Townsend assets occurred merely to avoid delays in the process because of Coudriet's unavailability.
Rule 1.7(a) of the Rules of Professional Conduct states: "A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: (1) The lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) Each client consents after consultation." According to Rule 1.7(b) of the Rules of Professional Conduct, "[a] lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless: (1) The lawyer reasonably believes the representation will not be adversely affected; and (2) The client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved."
Even if the court accepted the respondent's version of the facts, the respondent engaged in conflicts of interest that he should have realized would have materially limited or adversely affected his relationship with his other clients. The respondent represented H.P. Townsend until September 1991. Yet, he commenced his representation with TCE on May 20, 1991. The respondent testified that he thought that Barrett-McCord was attempting to create a consulting company. At the same time, Barrett wanted to create a separate company called SDI to acquire the assets of H.P. Townsend. The respondent admitted he had suspicions during his March 1991 meeting with Barrett that Barrett's scheme would involve Barrett-McCord's prospective corporation. Despite this suspicion, he engaged in the representation of TCE.
Regardless of the respondents assertions, the court concludes that the respondent understood exactly what the Barrett and Barrett-McCord's intentions were concerning TCE. The respondent knew that TCE wanted to acquire the assets of H.P. Townsend. He had several meetings with Barrett or Barrett-McCord and billed TCE on numerous occasions prior to his withdrawal from the CT Page 12405 representation of H.P. Townsend. Undoubtedly, his representation of TCE, a company interested in acquiring machine tool equipment, could improperly influence his representation of H.P. Townsend. Instead, the respondent apparently saw H.P. Townsend as a lost cause and attempted to maintain a continued relationship with Barrett in the future through TCE.
Under the respondent's scenario, the representation of TCE and MT during the acquisition of H.P. Townsend assets from Coudriet also demonstrates a situation that the respondent, acting in a reasonable manner, should have avoided. It is reasonable to assume that the respondent's personal and professional relationship with Coudriet would adversely effect his relationship with his clients, TCE and MT. While the respondent testified that the terms of Coudriet's leases to TCE and MT were beneficial to his clients, the respondent's involvement in this transaction is something a reasonably prudent attorney would avoid.
In any event, the court concludes that the respondent did not engage in a conflict of interest involving the leases of H.P. Townsend assets to TCE and MT because it was the intention of all concerned parties to use Coudriet as a cover for Barrett and Barrett-McCord's interests. The respondent's claim that Coudriet wanted to pursue the acquisition of the assets as a business opportunity is not credible given his ongoing relationship with Barrett and Barrett-McCord. The use of the power of attorney by Coudriet further demonstrates her lack of any legitimate involvement in the acquisition of the H.P. Townsend assets. Therefore, the court concludes that the respondent did not engage in any conflict of interest involving Barrett, Barrett-McCord, and Coudriet because all clients had an adequate understanding of the transactions and consented to them.
While the respondent's involvement in the acquisition of assets by TCE and MT from Coudriet may not constitute a conflict of interest, the respondent's loan to Coudriet and his subsequent acquisition of Coudriet's interest in the H.P. Townsend equipment and leases demonstrate a serious conflict of interest. Rule 1.8 of the Rules of Professional Conduct states in relevant part: "A lawyer shall not enter into a business transaction . . . with a client or former client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client or former client unless: (1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to CT Page 12406 the client or former client and are fully disclosed and transmitted in writing to the client or former client in a manner which can be reasonably understood by the client or former client; (2) The client or former client is advised in writing that the client or former client should consider seeking the advice of independent counsel in the transaction and is given a reasonable opportunity to do so; [and] (3) the client or former client consents in writing thereto. . . ." In the present case, the respondent loaned Coudriet $30,500 in order for her to acquire the H.P. Townsend assets. The respondent testified that he told Barrett that he would have a debtor-creditor relationship with Coudriet. Despite Barrett's consent, there is no indication that the respondent made a written disclosure to TCE or MT, or informed TCE or MT that they should consider the advice of independent counsel. In addition, the respondent did not provide any written disclosure of his possible position as a creditor to TCE and MT prior the assignment between himself and Coudriet. The evidence also fails to demonstrate any written disclosure to TCE and MT for about seven months after the assignment. Regardless of how the respondent wants the court to construe the assignment, he committed a violation of rule 1.8 of the Rules of Professional Conduct.
Finally, the petitioner alleges that the respondent presented meritless claims in the Superior Court in violation of rule 3.1 of the Rules of Professional Conduct by suing TCE and MT and not disclosing the promissory note to Barbara Barrett. The petitioner also claims that the respondent frivolously filed an objection to a motion to cite in TCE in another civil case.
The respondent contends that he had a good faith belief that the leases and notes held by Coudriet were part of an arms-length transaction. He also insists that he made a disclosure about the Barbara Barrett note within his answer and filed an exhibit disclosing the note. Therefore, the respondent insists that his filings within the Superior Court were meritorious.
Rule 3.1 of the Rules of Professional Conduct states in relevant part: "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law."
The court concludes that the filing of the initial pleadings CT Page 12407 presented several assertions and claims that were meritless. For example, the respondent could not make a good faith argument that TCE and MT committed civil theft. General Statutes § 52-564
states: "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages." The nature of the entire transaction that the respondent structured demanded the appearance of an armslength transaction. However, the $40,000 loan of Barbara Barrett proves that this was not a genuine arms-length transaction. Considering the respondent's involvement with Coudriet's purchase of the H.P. Townsend assets and the $40,000 promissory note held by Barbara Barrett, he could not make a good faith claim that TCE or MT stole his property. In addition, the respondent could not make a good faith claim that he was entitled to $65,000, the entire principal due on the promissory note originally held by Coudriet. While the respondent did provide $30,500 for the purchase of the assets, the respondent's demand for the entire principal due on promissory note originally held by Coudriet is absurd in light of Barbara Barrett's interest.
The petitioner alleges in count six that his claims in JarvisProducts Corp. v. Cleveland Tapping Machine Co., supra, Superior Court, Docket No. 399783, were meritless. In Jarvis, the respondent argued that TCE was not the successor to H.P. Townsend. Despite his significant involvement with the formation of TCE and the use of Coudriet as a cover for the Barrett's interests, the respondent accused the plaintiffs of bringing a frivolous suit. In TCE's objection to the motion to cite them in, the respondent stated: "Plaintiff apparently is seeking any `deep pocket' that it can find inasmuch as Defendant Townsend and its division, Cleveland, are insolvent and inactive, from which Plaintiff has no reasonable expectation of recovery." While the respondent may have been able to make a good faith argument that TCE was not the successor of H.P. Townsend, the respondent's assertions that Coudriet was an independent investor with no connection to H.P. Townsend and that the claims of the plaintiff in Jarvis were meritless constitute a violation of rule 3.1 of the Rule of Professional Conduct. The respondent could not make those assertions in good faith under the circumstances.
"Attorney disciplinary proceedings are for the purpose of preserving the courts of justice from the official ministration of persons unfit to practice in them. . . . An attorney as an officer of the court in the administration of justice, is continually accountable to it for the manner in which he CT Page 12408 exercises the privilege which has been accorded him. His admission is upon the implied condition that his continued enjoyment of the right conferred is dependent upon his remaining a fit and safe person to exercise it, so that when he, by misconduct in any capacity, discloses that he has become or is an unfit or unsafe person to be entrusted with the responsibilities and obligations of an attorney, his right to continue in the enjoyment of his professional privilege may and ought to be declared forfeited. . . . Therefore, [i]f a court disciplines an attorney, it does so not to mete out punishment to an offender, but [so] that the administration of justice may be safeguarded and the courts and the public protected from the misconduct or unfitness of those who are licensed to perform the important functions of the legal profession." (Citations omitted; internal quotation marks omitted.) Statewide Grievance Committee v.Spirer, 247 Conn. 762, 771-72, 725 A.2d 948 (1999). "[A] trial court faced with an attorney found guilty of misconduct has the inherent judicial power, derived from judicial responsibility for the administration of justice, to exercise sound discretion to determine what sanction to impose in light of the entire record before it." (Internal quotation marks omitted.) Id., 781.
"[I]n a grievance proceeding, the standard of proof applicable in determining whether an attorney has violated the [Rules] of Professional [Conduct] is clear and convincing evidence. . . . The burden is on the statewide grievance committee to establish the occurrence of an ethics violation by clear and convincing proof. . . . [C]lear and convincing proof denotes a degree of belief that lies between the belief that is required to find the truth or existence of the [fact in issue] in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. . . . [The burden] is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." (Citations omitted; internal quotation marks omitted.) Somers v.Statewide Grievance Committee, 245 Conn. 277, 290-91,715 A.2d 712 (1998).
In the present case, the petitioner has proven by clear and convincing evidence that the respondent counseled false testimony, engaged in misrepresentations to the Superior Court, engaged in conflicts of interest, and presented meritless claims to the Superior Court. Accordingly, it is the decision of this CT Page 12409 court that the respondent, David M. Somers be disbarred from the practice of law effective September 15, 1999.
So ordered,
John J. Langenbach